# SUPREME COURT OF THE UNITED STATES

_____

No. 20A136 (20–746)

_____

SOUTH BAY UNITED PENTECOSTAL CHURCH,
ET AL., *v.* GAVIN NEWSOM, GOVERNOR OF
CALIFORNIA, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[February 5, 2021]

The application for injunctive relief presented to JUSTICE KAGAN and by her referred to the Court is granted in part. Respondents are enjoined from enforcing the Blueprint's Tier 1 prohibition on indoor worship services against the applicants pending disposition of the petition for a writ of certiorari. The application is denied with respect to the percentage capacity limitations, and respondents are not enjoined from imposing a 25% capacity limitation on indoor worship services in Tier 1. The application is denied with respect to the prohibition on singing and chanting during indoor services. This order is without prejudice to the applicants presenting new evidence to the District Court that the State is not applying the percentage capacity limitations or the prohibition on singing and chanting in a generally applicable manner. Should the petition for a writ of certiorari be denied, this order shall terminate automatically. In the event the petition for a writ of certiorari is granted, the order shall terminate upon the sending down of the judgment of this Court.

JUSTICE THOMAS and JUSTICE GORSUCH would grant the application in full.

JUSTICE ALITO would grant the application with respect to all of the capacity restrictions on indoor worship services and the prohibition against indoor singing and chanting,

and would stay for 30 days an injunction against the percentage attendance caps and the prohibition against indoor singing and chanting.  JUSTICE ALITO would have the stay lift in 30 days unless the State demonstrates clearly that nothing short of those measures will reduce the community spread of COVID–19 at indoor religious gatherings to the same extent as do the restrictions the State enforces with respect to other activities it classifies as essential.

CHIEF JUSTICE ROBERTS, concurring in the partial grant of application for injunctive relief.

As I explained the last time the Court considered this evolving case, federal courts owe significant deference to politically accountable officials with the "background, competence, and expertise to assess public health."  *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ___, ___ (2020) (opinion concurring in denial of application for injunctive relief) (slip op., at 2).  The State has concluded, for example, that singing indoors poses a heightened risk of transmitting COVID–19.  I see no basis in this record for overriding that aspect of the state public health framework.  At the same time, the State's present determination—that the maximum number of adherents who can safely worship in the most cavernous cathedral is zero—appears to reflect not expertise or discretion, but instead insufficient appreciation or consideration of the interests at stake.

I adhere to the view that the "Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States."  *Ibid.* (internal quotation marks and alteration omitted).  But the Constitution also entrusts the protection of the people's rights to the Judiciary—not despite judges being shielded by life tenure, see *post,* at 6 (KAGAN, J., dissenting), but because they are.  Deference, though broad, has its limits.

# SUPREME COURT OF THE UNITED STATES

———————

No. 20A136 (20–746)

———————

## SOUTH BAY UNITED PENTECOSTAL CHURCH, ET AL., *v.* GAVIN NEWSOM, GOVERNOR OF CALIFORNIA, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[February 5, 2021]

JUSTICE BARRETT, with whom JUSTICE KAVANAUGH joins, concurring in the partial grant of application for injunctive relief.

I agree with JUSTICE GORSUCH's statement, save its contention that the Court should enjoin California's prohibition on singing and chanting during indoor services. The applicants bore the burden of establishing their entitlement to relief from the singing ban. In my view, they did not carry that burden—at least not on this record. As the case comes to us, it remains unclear whether the singing ban applies across the board (and thus constitutes a neutral and generally applicable law) or else favors certain sectors (and thus triggers more searching review). Of course, if a chorister can sing in a Hollywood studio but not in her church, California's regulations cannot be viewed as neutral. But the record is uncertain, and the decisions below unfortunately shed little light on the issue. As the order notes, however, the applicants remain free to show that the singing ban is not generally applicable and to advance their claim accordingly.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20A136 (20–746)

_____

## SOUTH BAY UNITED PENTECOSTAL CHURCH, ET AL., *v.* GAVIN NEWSOM, GOVERNOR OF CALIFORNIA, ET AL.

### ON APPLICATION FOR INJUNCTIVE RELIEF

[February 5, 2021]

Statement of JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE ALITO join.

Often, courts addressing First Amendment free exercise challenges face difficult questions about whether a law reflects "'subtle departures from neutrality,'" "'religious gerrymander[ing],'" or "impermissible targeting" of religion. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 534–535 (1993). But not here. Since the arrival of COVID–19, California has openly imposed more stringent regulations on religious institutions than on many businesses. The State's spreadsheet summarizing its pandemic rules even assigns places of worship their own row. See App. to Emergency Application for Writ of Injunction, App. G–3. At "Tier 1," applicable today in most of the State, California forbids any kind of indoor worship. Meanwhile, the State allows most retail operations to proceed indoors with 25% occupancy, and other businesses to operate at 50% occupancy or more. See *ibid*; see also \_\_\_ F. 3d \_\_\_, 2021 WL 222814, App. A (CA9, Jan. 22, 2021). Apparently, California is the only State in the country that has gone so far as to ban *all* indoor religious services. See Brief for Becket Fund for Religious Liberty as *Amicus Curiae*, 5–6.

When a State so obviously targets religion for differential treatment, our job becomes that much clearer. As the Ninth Circuit recognized, regulations like these violate the First

Amendment unless the State can show they are the least restrictive means of achieving a compelling government interest. ___ F. 3d, at ___, 2021 WL 222814, *9.

In cases implicating this form of "strict scrutiny," courts nearly always face an individual's claim of constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety. It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests. Of course we are not scientists, but neither may we abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions, and our precedents make plain that it has always been a demanding and rarely satisfied standard. See *Lukumi*, 508 U. S., at 546. Even in times of crisis—perhaps *especially* in times of crisis—we have a duty to hold governments to the Constitution.

Still, California says it can thread the needle. It insists that religious worship is so different that it demands especially onerous regulation. The State offers essentially four reasons why: It says that religious exercises involve (1) large numbers of people mixing from different households; (2) in close physical proximity; (3) for extended periods; (4) with singing.

No one before us disputes that factors like these may increase the risk of transmitting COVID–19. And no one need doubt that the State has a compelling interest in reducing that risk. This Court certainly is not downplaying the suffering many have experienced in this pandemic. But California errs to the extent it suggests its four factors are always present in worship, or always absent from the other secular activities its regulations allow. Nor has California sought to explain why it cannot address its legitimate concerns with rules short of a total ban. Each of the State's shortcomings are telltale signs this Court has long used to

identify laws that fail strict scrutiny. See, *e.g., First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 793 (1978) (The State's proffered "purpose is belied, however, by the provisions of the statute, which are both underinclusive and overinclusive.").

Consider California's arguments in turn. The State presumes that worship inherently involves a large number of people. Never mind that scores might pack into train stations or wait in long checkout lines in the businesses the State allows to remain open. Never mind, too, that some worshippers may seek only to pray in solitude, go to confession, or study in small groups. See *Harvest Rock Church, Inc.* v. *Newsom,* App. to Emergency Application for Writ of Injunction, No. 20A137, Exh. A, No. 20–56357, p. 4, n. 1 (CA9, Jan. 25, 2021) (O'Scannlain, J., specially concurring). Nor does California explain why the less restrictive option of limiting the number of people who may gather at one time is insufficient for houses of worship, even though it has found that answer adequate for so many stores and businesses.

Next, the State tells us that worshippers are sure to seek close physical interactions. It touts its mild climate, too, suggesting that worshippers might enjoy more space outdoors. Yet, California is not as concerned with the close physical proximity of hairstylists or manicurists to their customers, whom they touch and remain near for extended periods. The State does not force them or retailers to do all their business in parking lots and parks. And California allows people to sit in relatively close proximity inside buses too. Nor, again, does California explain why the narrower options it thinks adequate in many secular settings—such as social distancing requirements, masks, cleaning, plexiglass barriers, and the like—cannot suffice here. Especially when those measures are in routine use in religious services across the country today.

California worries that worship brings people together

for too much time. Yet, California does not limit its citizens to running in and out of other establishments; no one is barred from lingering in shopping malls, salons, or bus terminals. Nor, yet again, has California explained why more narrowly tailored options, like a reasonable limit on the length of indoor religious gatherings, would fail to meet its concerns.

When it comes to each of the first three factors, California singles out religion for worse treatment than many secular activities. At the same time, the State fails to explain why narrower options it finds sufficient in secular contexts do not satisfy its legitimate interests. Recently, this Court made it abundantly clear that edicts like California's fail strict scrutiny and violate the Constitution. See *Roman Catholic Diocese of Brooklyn* v. *Cuomo, ante,* at ___ (*per curiam*). Today's order should have been needless; the lower courts in these cases should have followed the extensive guidance this Court already gave.[1]

If I have a quibble with the Court's order, it is with how it addresses California's final factor, singing. While the Court's order requires California to allow churches to open, it also permits California to enforce, for now, a categorical ban on singing during services. This much might seem understandable. California has sensibly expressed concern that singing may be a particularly potent way to transmit the disease, and it has banned singing not just at indoor worship services, but at indoor private gatherings, schools, and restaurants too.

But, on further inspection, the singing ban may not be

---

[1] While today's case concerns the total ban on indoor worship found in "Tier 1," nothing in our order precludes future challenges to the other disparate occupancy caps applicable to places of worship, particularly in "Tiers" 2 through 4. See App. to Emergency Application for Writ of Injunction, App. G–3.

what it first appears. It seems California's powerful enter-tainment industry has won an exemption.[2] So, once more, we appear to have a State playing favorites during a pandemic, expending considerable effort to protect lucrative industries (casinos in Nevada; movie studios in California) while denying similar largesse to its faithful. See, *e.g., Calvary Chapel Dayton Valley* v. *Sisolak*, 591 U. S. \_\_\_, \_\_\_ 2020) (GORSUCH, J., dissenting from denial of application for injunction relief).

Once more, too, the State has not explained how a total ban on religious singing is narrowly tailored to its legitimate public health concerns. Even if a full congregation singing hymns is too risky, California does not explain why even a single masked cantor cannot lead worship behind a mask and a plexiglass shield. Or why even a lone muezzin may not sing the call to prayer from a remote location inside a mosque as worshippers file in. The Ninth Circuit sought to defend California's uneven regime by observing that the

——————

[2] There is some confusion over what rules actually apply to Hollywood but I would not allow the government officials who created California's complex regime to benefit from its confusing nature. The district court did not address the singing ban, and the Ninth Circuit applied rational-basis review because it was not convinced that *anyone* is permitted to sing indoors in California. \_\_\_ F. 3d., \_\_\_, 2021 WL 222814, *18 (CA9, Jan. 22, 2021). But the record suggests that music, film, and television studios *are* permitted to sing indoors. See Record in No. 20–56358, Doc. 18–4, p. 124 (CA9) (decl. of Screen Actors Guild General Counsel) ("Singing in larger groups [inside the studio] is permitted but only . . . with additional protections."). California's most recent edict prohibits singing at "private" "social situations" as well as "activities protected by the First Amendment to the extent they are not already permitted by other guidance." California Dept. of Public Health, Guidance for the Prevention of COVID–19 Transmission for Gatherings (updated Nov. 13, 2020). No one seems to know exactly how far this language stretches, but it seems unlikely to apply to the entertainment industry, which has its own governing guidance. And California does not squarely deny as much here. See Brief in Opposition 51–52, and n. 52. As the Court recognizes, though, nothing in today's order precludes future relief on this claim either.

entertainment industry has adopted COVID–19 testing protocols. See ___ F. 3d., at ___, 2021 WL 222814, *13. But, if that's true, it is unclear why California's religious institutions might be denied a similar opportunity. Rather than assume such testing is infeasible, California might have at least offered the option, or sought to adapt it to churches. In my view, the State must do more to tailor the requirements of public health to the rights of its people. The Court's order today at least allows the applicants to press these points on remand.

No doubt, California will argue on remand, as it has before, that its prohibitions are merely temporary because vaccinations are underway. But the State's "temporary" ban on indoor worship has been in place since August 2020, and applied routinely since March. California no longer asks its movie studios, malls, and manicurists to wait. And one could be forgiven for doubting its asserted timeline. Government actors have been moving the goalposts on pandemic-related sacrifices for months, adopting new benchmarks that always seem to put restoration of liberty just around the corner. As this crisis enters its second year—and hovers over a second Lent, a second Passover, and a second Ramadan—it is too late for the State to defend extreme measures with claims of temporary exigency, if it ever could. Drafting narrowly tailored regulations can be difficult. But if Hollywood may host a studio audience or film a singing competition while not a single soul may enter California's churches, synagogues, and mosques, something has gone seriously awry.

# SUPREME COURT OF THE UNITED STATES

————

No. 20A136 (20–746)

————

## SOUTH BAY UNITED PENTECOSTAL CHURCH, ET AL., *v.* GAVIN NEWSOM, GOVERNOR OF CALIFORNIA, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[February 5, 2021]

JUSTICE KAGAN, with whom JUSTICE BREYER and JUSTICE SOTOMAYOR join, dissenting.

Justices of this Court are not scientists. Nor do we know much about public health policy. Yet today the Court displaces the judgments of experts about how to respond to a raging pandemic. The Court orders California to weaken its restrictions on public gatherings by making a special exception for worship services. The majority does so even though the State's policies treat worship just as favorably as secular activities (including political assemblies) that, according to medical evidence, pose the same risk of COVID transmission. Under the Court's injunction, the State must instead treat worship services like secular activities that pose a much lesser danger. That mandate defies our caselaw, exceeds our judicial role, and risks worsening the pandemic.

Start with the governing law. We have held time and again that the First Amendment demands "neutrality" in actions affecting religion. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 532 (1993). A government cannot put limits on religious conduct if it "fail[s] to prohibit nonreligious conduct that endangers" the government's interests "in a similar or greater degree." *Id.,* at 543. That principle, though, has a corollary: The "Constitution does not require things which are different in fact . . . to be

treated in law as though they were the same." *Plyler* v. *Doe*, 457 U. S. 202, 216 (1982). So "States must treat like cases alike but may treat unlike cases accordingly." *Vacco* v. *Quill*, 521 U. S. 793, 799 (1997); see *Lukumi*, 508 U. S., at 542.[1]

California's response to the COVID pandemic satisfies that neutrality rule by regulating worship services the same as other activities "where large groups of people [come together] in close proximity for extended periods of time." *South Bay United Pentecostal Church* v. *Newsom*, 590 U. S. ___, ___ (2020) (ROBERTS, C. J., concurring in denial of application for injunctive relief) (slip op., at 2). The restricted activities include attending a worship service or political meeting; going to a lecture, movie, play, or concert; and frequenting a restaurant, winery, or bar. So the activities are both religious and secular—and many of the secular gatherings, too, are constitutionally protected. In all those communal activities, California requires mask wearing and social distancing, and bars indoor singing and chanting, to reduce the risk of COVID transmission. In addition, the State has put limits on how many people can assemble in one indoor space—whether a church, theater, or lecture hall. Depending on COVID case and test-positivity rates, public gatherings may occur only at specified occupancy levels—for example, at 50% or 25% of a facility's capacity. And when COVID rates are highest, all those capacity limits give way to a rule that the gathering—again, whether religious or secular—take place outdoors (with no limits on attendance). Given California's mild climate, that restriction—the one the Court today lifts for houses of worship alone—does not amount to a ban on the activity. Worship services, along with other gatherings, have taken

---

[1] Only if a government fails this neutrality test must its policy "be justified by a compelling government interest and . . . be narrowly tailored to advance that interest." *Lukumi*, 508 U. S., at 531–532.

place outdoors throughout this winter.

California's scheme homes in on these indoor gatherings because they pose a heightened danger of COVID transmission. In written testimony in this case, Dr. James Watt, the Chief of Communicable Diseases at the California Department of Public Health, explained: "There is broad consensus among epidemiologists that transmission (and thus spread) of the novel coronavirus is more likely" at "[i]ndoor public gatherings," which "bring together [many] people from different households." Decl. of Dr. James Watt in No. 3:20–cv–865 (SD Cal.), Doc. 81–3, ¶¶37, 44 (Watt Decl.). Dr. George Rutherford, a professor of epidemiology at the University of California, San Francisco School of Medicine, further elaborated on the point. He described the "increase[]" in risk when gatherings "are of an extended duration, and when there is a lot of verbal interaction, especially when there is group singing, chanting, or other loud vocalization" like speeches or sermons. Decl. of Dr. George Rutherford in No. 3:20–cv–865, Doc. 81–4, ¶91 (Rutherford Decl.). That risk, of course, extends not only to the participants themselves, but to everyone they associate with in a community. See Watt Decl., ¶42.

The medical experts also testified about why California imposed more severe capacity limits on gathering places like churches and theaters than on other indoor sites. The State's regulation of retail stores is less stringent, Dr. Rutherford explained, because shopping "involves less close proximity" with other people—and for less time—than does an indoor worship service, lecture, or similar event. Rutherford Decl., ¶113; see *id.*, ¶117. For that reason, shoppers are "less likely to receive a sufficient viral load of droplets" to contract COVID. *Id.*, ¶113. Similarly, Dr. Rutherford observed, workplaces can have higher capacity limits because employers (and, by extension, their employees) must comply with "detailed, workplace-specific COVID preven-

tion plans subject to enforcement by State labor authorities." *Id.*, ¶121. Film production studios in California, for example, must test their employees as many as three times a week—a requirement that "could not feasibly be applied to the congregation of a house of worship." *Ibid.*, and n. 8.

Given all that evidence, California's choices make good sense. The State is desperately trying to slow the spread of a deadly disease. It has concluded, based on essentially undisputed epidemiological findings, that congregating together indoors poses a special threat of contagion. So it has devised regulations to curb attendance at those assemblies and—in the worst times—to force them outdoors. Crucially, California has applied each of those rules equivalently to religious activities and to secular activities, including some with First Amendment protection of their own. Where the State has regulated religious conduct, it has as well regulated "nonreligious conduct that endangers [its] interests in a similar" way. *Lukumi*, 508 U. S., at 543. The only secular conduct the State treats better is the kind that its experts have found does not so imperil its interests—the kind that poses less risk of COVID transmission. Nothing in that policy violates the First Amendment.

Yet the Court will not let California fight COVID as it thinks appropriate. The Court has decided that the State must exempt worship services from the strictest aspect of its regulation of public gatherings. No one can know, from the Court's 19-line order, exactly why: Is it that the Court does not believe the science, or does it think even the best science must give way? In any event, the result is clear: The State may not treat worship services like activities found to pose a comparable COVID risk, such as political meetings or lectures. Instead, the State must treat this one communal gathering like activities thought to pose a much lesser COVID risk, such as running in and out of a hardware store. In thus ordering the State to change its public

health policy, the Court forgets what a neutrality rule demands. The Court insists on treating unlike cases, not like ones, equivalently.[2]

This is no garden-variety legal error: In forcing California to ignore its experts' scientific findings, the Court impairs the State's effort to address a public health emergency. There are good reasons why the Constitution "principally entrusts the safety and the health of the people" to state officials, not federal courts. *South Bay*, 590 U. S., at ___ (ROBERTS, C. J., concurring) (slip op., at 2) (internal quotation marks and alteration omitted). First among them is that judges "lack[] the background, competence, and expertise to assess public health." *Ibid.* To state the obvious, judges do not know what scientists and public health experts do. I am sure that, in deciding this case, every Justice carefully examined the briefs and read the decisions below. But I cannot imagine that any of us delved into the scientific research on how COVID spreads, or studied the strategies for containing it. So it is alarming that the Court second-guesses the judgments of expert officials, and displaces their conclusions with its own. See *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, *ante*, at 3 (SOTOMAYOR, J., dissenting). In the worst public health crisis in a century, this

_____

[2] For much this reason, the Court's decision in *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, *ante,* p. ___ (*per curiam*), does not require today's injunction. There, the Court found that New York had "single[d] out houses of worship for especially harsh treatment." *Ante,* at 3. But here, according to the epidemiological evidence in the record, California has treated houses of worship identically to other facilities with the same risk. It is the Court, not the State, that "single[s] out" religious activity— separating it from other equally risky public gatherings. What is more, *Roman Catholic Diocese* held, at a time when New York was lifting restrictions to reflect declining case rates, that the policy at issue was "far more severe than has been shown to be required to prevent the spread of the virus." *Ante*, at 4. No court—or, at any rate, no court with any sense of modesty—can make that claim here. California's hospitals are near maximum capacity, and over 3,500 state residents perished from the virus just last week.

foray into armchair epidemiology cannot end well.

And who knows what today's decision will mean for other restrictions challenged in other cases? The Court's order exempts churches only from California's indoor ban, leaving its capacity restrictions in place (at least for now). That is all to the good: The injunction stops short of giving the churches all their requested relief. But the scope of the order raises questions. When are such capacity limits permissible, and when are they not? And is an indoor ban never allowed, or just not in this case? Most important—do the answers to those questions or similar ones turn on record evidence about epidemiology, or on naked judicial instinct? The Court's decision leaves state policymakers adrift, in California and elsewhere. It is difficult enough in a predictable legal environment to craft COVID policies that keep communities safe. That task becomes harder still when officials must guess which restrictions this Court will choose to strike down. The Court injects uncertainty into an area where uncertainty has human costs.

All this from unelected actors, "not accountable to the people." *South Bay*, 590 U. S., at ___ (ROBERTS, C. J., concurring) (slip op., at 2). I fervently hope that the Court's intervention will not worsen the Nation's COVID crisis. But if this decision causes suffering, we will not pay. Our marble halls are now closed to the public, and our life tenure forever insulates us from responsibility for our errors. That would seem good reason to avoid disrupting a State's pandemic response. But the Court forges ahead regardless, insisting that science-based policy yield to judicial edict. I respectfully dissent.